# IN THE MATTER OF HARRY GEORGE HYRA, AN ATTORNEY-AT-LAW OF NEW JERSEY.

Argued March 8, 1954—Decided April 5, 1954.

*Mr. Henry W. Clement* argued the cause for the Ethics and Grievance Committee for Union County.

*Mr. Milton M. Unger* argued the cause for the respondent (*Messrs. Milton M. Unger* and *Adrian M. Unger*, attorneys).

PER CURIAM. In each county of the State there is appointed by this court a committee on character and fitness, *R. R.* 1:20–6, whose duty it is to investigate the character and fitness of all candidates for admission as attorneys-at-law of this State, resident in the respective counties. Such investigation is made at the time of the commencement of clerkship and again previous to the time of taking the bar examinations. No applicant for admission as an attorney is allowed to take the bar examination until his character and fitness committee has filed with the secretary of the Board of Bar Examiners a certificate that the applicant is of good moral character and fit for the practice of the law.

It is apparent that the various character and fitness committees are one of the most important arms of the court and their work of prime importance.

██ One of the purposes of a character and fitness committee is to determine from interviews and other means at their disposal whether or not in their judgment one desirous of entering into a clerkship leading to the privilege of taking the bar examination has the character, the backbone, the integrity and the moral stamina to make him a good and acceptable member of the bar. Membership in the bar is a privilege burdened with conditions. A good character is one of them and compliance with that condition is essential at the moment of admission. It is important to the applicant to know at the earliest possible date, preferably before he starts on his years of study, whether in the judgment of the court, through its character and fitness committee, he is lacking in character sufficiently to disqualify him for admission to the bar.

██ A full disclosure of one's personal life and his affairs should be made by every prospective candidate and it can be

generally stated that there is no place in the law for a man who cannot, or will not, tell the truth even when his own interests are involved. In the legal profession particularly there must be reverence for truth.

Each applicant for the bar examination is required to make out under oath and file a preliminary statement at the inception of his clerkship and a final statement at the termination thereof. He is also required to furnish two written character references. One of the questions on the preliminary and final statements reads as follows:

"Have you ever been concerned as a party plaintiff or defendant, or witness in any legal proceedings? If so, state fully the court, administrative office or tribunal, the character of the proceedings and your relationship to it."

The respondent here did not disclose to his preceptor, the Union County Character and Fitness Committee, nor apparently to those writing character references for him, his past criminal record which will hereafter be alluded to. He took the bar examinations on three occasions, May 1950, January 1951 and June 1951, the latter of which he successfully passed, and on each occasion answered the question hereinbefore referred to falsely. While the question does not specifically ask whether or not the applicant has ever been convicted of crime, there can be little doubt but that the respondent knew its implication.

Parenthetically, it might be well that in the future the direct question of whether or not the applicant has ever been convicted of crime should be asked.

After the fact of the respondent's prior criminal record was brought to the attention of the court, a hearing was had by the Union County Character and Fitness Committee at its direction. Mr. Hyra appeared and answered the questions put to him with frankness. He was not evasive nor did he make any attempt to alibi an answer. He gave as his reason for not having disclosed his past criminal record that if he had made such a disclosure he was fearful he would be

denied the right to take the bar examination and that that would have been a terrible blow to him.

The fact that respondent had been convicted of a crime is not the most serious aspect of this case. It is the fact of his non-disclosure thereof and his false swearing.

There can be no question but that severe disciplinary action must be taken against this respondent but the majority of the court is of the opinion that the extreme penalty, disbarment, should not be imposed upon him in view of what we consider extenuating and mitigating circumstances, not concerning his derelictions but with respect to his exemplary life both before and after the occurrences heretofore related.

The respondent, when 18 years of age—he is now 33—was convicted on five allegations of burglary and larceny. Sentence was suspended and he was placed on probation. At the time he was a student at the Hillside High School, from which he graduated in June 1940. In April 1943 he was inducted into service in the United States Army. He was later commissioned and served in the Counter-Intelligence Corps and was honorably discharged from the army in April 1946. He had disclosed to the army authorities his criminal record, and before being admitted to the Counter-Intelligence Corps was investigated by the Federal Bureau of Investigation. After his discharge from the Army he attended Rutgers University Law School in Newark and the John Marshall Law School in Jersey City, graduating from the latter in 1950. Following his passage of the bar examination in June 1951, he took a civil service examination for municipal court clerk of Hillside and disclosed his record to the Civil Service Commission. He passed the examination and received the appointment and at the present time is serving in that capacity. He also has taken examinations for entrance into the Federal Bureau of Investigation service and as a United States Treasury Agent, and even with his record having been disclosed he is still open to call to the latter position. Mr. Hyra is married and has two children, one aged five years and one three months of age. He has purchased a home in Hillside and practices there. At the time of his appointment

as municipal court clerk the members of the township committee had full knowledge of his criminal background. Also, while his past record is generally known in the community in which he lives, he appears to be respected and as far as is known his professional relations with clients have been without blemish.

This is the first disciplinary case of its kind which has come before us and our disposition of it must serve as a salutary warning to all future applicants for admission to the bar. With this warning those transgressing in like manner can expect nothing short of disbarment.

The judgment of the court is that the respondent be suspended from the practice of the law for a period of two years and until the further order of this court.

VANDERBILT, C. J. (dissenting). From the earliest days in this State it has been a rule of court that "No person [shall] be admitted to such examination [to practice as an attorney at law], unless he * * * shall be of good moral character." 1 *N. J. L. vi. Rule* 3. The rule is not peculiar to New Jersey; it is a universal requirement, for good moral character is the first requirement of the profession, compared with which learning and diligence are of secondary importance. Accordingly we find our former Supreme Court holding:

"If it appear by the record of conviction that an applicant had been convicted of larceny, the court would not admit him to examination on a certificate of his good moral character. They would immediately upon proof of such fact strike his name from the roll after his admission. * * *

They [the court] limit the investigation to such acts as would, after his admission to the bar, be a ground for striking him from the roll. * * * The act charged involves fraud and moral turpitude. It is precisely such a charge, and rests upon such evidence as would, if committed in the course of practice, warrant the court in calling upon an attorney to show cause why his name should not be stricken from the roll." Per Chief Justice Green, the associate justices all concurring, in *On Application for Attorney's License*, 21 *N. J. L.* 345, at 346-347 (1848).

This decision reflects the strong weight of authority on the question everywhere (indeed, the decision has been quoted elsewhere; see 207 *N. W.* 710, 207 *N. W.* 970, 204 *P.* 950, 209 *P.* 488, 55 *S. E.* 639, 55 *S. E.* 643, 55 *S. E.* 645, 67 *S. E.* 601, 67 *S. E.* 608), and was until today the unchallenged law in this State.

As our bar grew in number and the clerkship became, with the allowance of credit for time spent in law schools, a secondary means of legal education, it became necessary here as in other states to set up in each county a committee on character and fitness (*Rule 7, sec.* 8 of the former Supreme Court, promulgated June 5, 1923) to:

"investigate the character and fitness of all candidates for admission as attorney at law resident in such county; no person shall be recommended for license until he shall have received the approval of the said committee."

The examinations of the applicants for admission to the bar by the committees on character and fitness have been strengthened from time to time by rule of court (see *R. R.* 1:20–6), but questionnaires have been used as the basis of such examinations since February 25, 1949 (former *Rule* 1:8–7). Each applicant must not only respond to such questionnaire under oath; he must also answer orally such inquiries as the members of the committee may propound to him in personal interviews. The work of these committees thus replaces, with reference to the primary characteristic of good moral character so indispensable to being a worthy member of a great profession, the examination which in earlier days took place before one or more of the justices of the Supreme Court. Accordingly, any representations made by an applicant to the committee on character and fitness of his county or any matters concealed from his committee are in legal effect representations made to the court and any concealment of facts is a concealment from the court itself.

In the present case the respondent on his three successive appearances before the committee on character and fitness preliminary to taking the bar examination, which he twice failed,

in legal effect deliberately answered "No" to the following question:

"Have you ever been concerned as a party plaintiff or defendant, or witness in any legal proceedings? If so, state fully the court, administrative office or tribunal, the character of the proceedings and your relationship to it."

in the face of the fact that he had pleaded guilty 12 years before to one allegation of larceny committed on November 15, 1938 and four allegations of burglary committed between April 8, 1939 and April 14, 1939, five months later, at the age of 18, for which sentence was suspended and for which he was placed on probation for two years. He also concealed his five convictions from the lawyers who vouched for him to the character and fitness committee and from the members of the character and fitness committee on the occasion of his three successive interviews with them.

This conduct is significant in view of the fact that he testified that he had disclosed to the Army authorities his convictions before he was admitted to the Counter-Intelligence Corps. After his first application for admission to the bar, which had been made possible by his false swearing to and concealments from the character and fitness committee, he made application for a position with the Federal Bureau of Investigation and likewise with the United States Treasury Department for a position as a law-enforcement agent, and in each case he disclosed his criminal record to these authorities. Likewise after he passed the bar examinations, he took a civil service examination for the office of municipal court clerk of Hillside. Here again he disclosed the fact of his prior convictions. In short, both before and after his false answers to and concealments from the committee on character and fitness preliminary to his taking the bar examinations he disclosed to four examining boards the fact of his convictions, but in none of these instances were the stakes as high as when he made his application for admission to the bar. When put to that test, he deliberately resorted to subterfuge with full knowledge of the chances he was taking. As he puts

it in an affidavit attached to his brief made for use on the return of the order to show cause herein:

> "The only reason which I can now give for my failure to disclose my record to the character and fitness committee is that as I now view it, I must have been fearful that if I did so I would be denied the right to take the bar examination, and this would have been a terrible blow to me."

He was willing to tell the truth when the stakes were not too vital to him, but quite unwilling to do so when the necessity for false swearing or concealment for his own benefit seemed great.

But the good moral character that our rules require does not mean good moral character in unimportant matters. It means good moral character at all times in all matters and with all people and especially when the choice is a difficult one to make from a personal standpoint. In the often conflicting tensions attendant on the practice of law as between the interests of an attorney and his client, and the interest of an attorney and his client on the one side and his adversary and his client on the other, or between an attorney on one side and the courts on the other, there is no place at the bar for a lawyer who may merely be trusted in minor matters.

It was not until March 2, 1954, when he made the affidavit quoted from herein, that Hyra was willing to admit his motive for his false swearing and concealment. Thus, at the hearing held by the committee on character and fitness on January 20, 1954, at the direction of this court when he was 33 years of age, he still attempted to excuse himself:

> "Frankly, I don't believe I was ever asked directly at any of these character committees whether I did have a criminal record."

brushing aside his false swearing and concealment in his written answers to the questionnaire. When asked if he did not feel it his duty to disclose his convictions, he replied:

> "Speaking today, of course, I feel it is essential. What was going through my mind at the time I cannot recall."

Then, when queried with respect to his false answers to the questionnaire, he said:

"I really didn't realize the serious nature of these indictments which you read to me. As a matter of fact, this is the first occasion I have had a repetition of the exact wording of these indictments, the severity of which I didn't recall at the time."

These are not the statements of a man who even yet realizes the enormity of his offense.

At the same hearing Hyra was asked if his preceptor knew of his criminal record, to which he responded:

"Yes, sir. He has full knowledge of it. As a matter of fact, he is a committeeman in Town, in Hillside, at the present time and he is one that I completely enlightened. As a matter of fact, the whole Committee has knowledge of this, the Committee at the time of my appointment has knowledge of my criminal background.

Q. Do I understand you to say then that Mr. Goldhor had knowledge of your criminal record either prior or during the period of your clerkship? A. I, with certainty, won't say that, sir. I'll say he knew after.

Q. Did he know at any time prior to your becoming a member of the Bar? A. I would say he did not know, no."

Asked if another lawyer would give him a letter of character reference to the committee in August, 1950, Hyra stated:

"Again, with certainty and in consideration of Mr. Kremer, I can't say definitely that he did."

The lawyer in question assures us:

"I had no knowledge in 1950 when I wrote a character reference for Mr. Hyra that he had at any time been convicted of a crime. If I had such information I would have set it forth in the letter written at that time."

This testimony can scarcely be called frank and honest.

In fact, even in his affidavit of March 2, 1954, submitted to the court by his counsel on the return of the order to show cause before us, after quoting in full the question to which he gave a false answer:

"Have you ever been concerned as a party plaintiff or defendant, or witness in any legal proceedings? If so, state fully the court, administrative office or tribunal, the character of the proceedings and your relationship to it."

he still attempted to justify himself by saying:

"This question does not directly interrogate me regarding a criminal record."

No man fit to be a member of the bar could fail to perceive that his having been a defendant in five criminal proceedings came within the scope of the query put to him. For one intellectually and morally qualified to seek admission to the bar it is clear and unambiguous. It is in the precise form used in various states including New York.

I cannot find in the record right up to the date of the hearing before this court the candor and frankness required of a member of the bar that the majority do.

## II.

I cannot agree with the majority with respect to the measure of punishment. At the time the false statements were made to the committee on character and fitness and that the respondent's convictions were concealed from it, he was 29 years of age. He had not only graduated from college and law school but had had three years of service in the armed forces in the Counter-Intelligence Corps. Surely he must be held to have reached the age of intellectual maturity and judgment. The criminal accusations to which he pleaded guilty occurred 11 years before when he was 18 years of age. We are not concerned with them. What we are now dealing with is his false swearing to and concealment from the character and fitness committee, and hence from the court, committed at the age of 29. By his fraud and false swearing he has obtained a status as a member of an honorable profession to which he was not entitled either in law or plain honesty. If he had committed such offenses while a member of the bar he would beyond any question have been subject to disbar-

ment. I can see no reason why one who obtains admission to the bar should be in a superior position to one who is already a member of the bar. The heavy preponderance of cases throughout the country from New York to California are all to the contrary. *In the Matter of Moskovitz,* 169 *App. Div.* 527, 155 *N. Y. S.* 485 (*Sup. Ct. A. D.* 1915), the court in revoking a respondent's license to practice law for falsifying his clerkship held:

"Under these circumstances, his admission to practice was unauthorized by law and was invalid. We are urged to be lenient towards this respondent, but this is not a case for either leniency or severity. The only question is whether respondent's admission to the bar was valid. Obviously it was invalid, because he was not properly qualified to apply for admission."

In *In re Carpel,* 178 *App. Div.* 146, 165 *N. Y. S.* 102 (*Sup. Ct. A. D.* 1917), where the respondent suppressed the fact that indictments had been found against him, the court in disbarring the respondent said that:

"The power to admit to the bar on motion is conferred 'in the discretion of the Appellate Division.' In the exercise of that discretion, the court should be informed truthfully and frankly of matters tending to show the character of the applicant and his standing at the bar of the state from which he comes. The finding of indictments against him, one of which was still outstanding at the time of his motion, were facts which should have been submitted to the court, with such explanations as were available. Silence respecting them was reprehensible, as tending to deceive the court."

In *In re Klein,* 242 *App. Div.* 494, 275 *N. Y. S.* 703 (*Sup. Ct. A. D.* 1934), the respondent procured his license to practice law by fraudulent representations and concealment before the character and fitness committee. Speaking for the court Presiding Judge Finch said:

"This proceeding must be clearly differentiated from one instituted for the punishment of an attorney whose license to practice law was regularly and duly procured. The charge sustained by the referee is not the performance of some unprofessional act subsequent to a valid admission to the bar, but is a charge that the very admission to the bar of respondent was tainted by fraud and was secured by false representations and concealments. Therefore there is involved

no question of leniency or severity. When once it has been proved that respondent secured his admission fraudulently, only one result reasonably can follow, and that is the revocation of the license thus fraudulently obtained. This distinction between suspension and disbarment on the one hand and the revocation of the license to practice law on the other is emphasized both in the statutes and the decisions. Where a duly and regularly licensed attorney commits an act of professional misconduct, three courses are open: namely, a censure, a suspension, or a disbarment. In a case, however, where a person gains his admission by misrepresentation or concealment, the Appellate Division is authorized to 'revoke such admission.'

\*        \*        \*        \*        \*        \*        \*        \*

*"It has been well held that fraud practiced by an applicant for admission to the bar, which affects even in the slightest degree his admission, strikes at the very foundation of his license to practice. To hold that a person may gain admission to the bar by misrepresentation or suppression of the truth and, if subsequently detected, may then use this fraudulently obtained certificate after a period of suspension, and thus be on a par with one who has rightfully come into the enjoyment of his professional privileges and obligations and thereafter stand upon an equal parity with the latter, would be to cast an aspersion upon every honest member of the profession."* 275 N. Y. S. 703, at pages 704–705.

In *In re Schecht,* 242 *App. Div.* 495, 275 *N. Y. S.* 712 (*Sup. Ct. A. D.* 1934), the respondent filed his sworn application with the character and fitness committee in which he falsely answered "no" to the query as to whether he had ever been involved in any civil or criminal proceeding. Actually he had been a party to an annulment action by his wife. There was a second charge against him that after admission to the bar he had sworn falsely on an application for a marriage license. The court revoked his license "since it clearly appears that the respondent procured his admission to the bar by means of fraudulent concealment" (275 *N. Y. S.* 712, at *page* 716), which shows that the first charge was the basis for the revocation.

In *In re Baldwin,* 258 *App. Div.* 661, 17 *N. Y. S.* 2d 727 (*Sup. Ct. A. D.* 1940), the respondent in his statement to the character and fitness committee falsely swore that he had served the required clerkship. The court stated:

"It thus appears that, in addition to willful misrepresentation and suppression of required information, respondent was not eligible for

admission to the Bar and was an intruder, for he had not served a clerkship as required by the said Rule of the Court of Appeals." 17 *N. Y. S.* 2d 727, at *page* 729.

The court found that since admission he had also been guilty of false swearing at his trial for bribery and also other reprehensible conduct. His admission to the bar was revoked and his name ordered to be stricken from the roll of attorneys.

In *In re Braunstone*, 265 *App. Div.* 337, 38 *N. Y. S.* 2d 593 (*Sup. Ct. A. D.* 1942), motion for reargument or leave to appeal denied 265 *App. Div.* 1040, 39 *N. Y. S.* 2d 1004 (1943), the respondent twice in 1932 gave false answers in a questionnaire verified by him and filed with the character and fitness committee. He falsely failed to reveal, in answer to the query whether he had been a party to any action or proceeding other than those referred to in his questionnaire, that his wife in 1929 had started an annulment action against him on the ground of fraud. His motive was to conceal the fact that he had defaulted in an action in which he was charged with fraud. The court then states:

"The respondent thus procured his admission to the Bar by filing a questionnaire, verified by him, which contained false answers. Such a fraud upon the court is sufficient to warrant the revocation of his license to practice law." 38 *N. Y. S.* 2d 593, at *page* 594.

The court further found that since his admission to the bar the respondent had been guilty of procuring an annulment of his marriage through fraud. He was ordered disbarred.

Disciplinary matters rarely find their way to the New York Court of Appeals but in *In re Rouss,* 221 *N. Y.* 81, 116 *N. E.* 782 (*Ct. App.* 1917), *certiorari* denied *Rouss v. Association of Bar of City of New York,* 246 *U. S.* 661, 38 *S. Ct.* 332, 62 *L. Ed.* 927 (1918), Judge Cardozo speaking for the court made these pertinent observations in affirming the disbarment of the appellant for unethical conduct:

"Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them. Compliance

with that condition is essential at the moment of admission; but it is equally essential afterwards. \* \* \* Whenever the condition is broken the privilege is lost." 116 *N. E.* 782, at *page* 783.

The California decisions are in accord with those of New York. In *In re Holland*, 96 *Cal. App.* 655, 274 *P.* 559 (*D. Ct. App.* 1929), the respondent prior to admission had been convicted of several offenses in the Philippine Islands, but had been pardoned. He failed to reveal his convictions in his application for admission to the California bar. It was held that his license should be revoked, since he had perpetrated a fraud on the court:

"Nor can it be questioned that such conduct constitutes a fraud upon this court which upon principle and precedent (see *In re Mash*, 28 *Cal. App.* 692, 153 *P.* 961, and *In re Wells*, 174 *Cal.* 467, 163 *P.* 657) authorizes and compels us to revoke the license granted." 274 *P.* 559, at *page* 560.

In *State Bar of California v. Hull*, 103 *Cal. App.* 302, 284 *P.* 492, 493 (*D. Ct. App.* 1930), an attorney from another state in his petition for admission to the bar withheld from the board of examiners the fact that he had been convicted of offenses involving moral turpitude. In disbarring the respondent the court said:

" 'Regardless of whether the charges previously preferred against the respondent were well or ill founded, we hold that it was his duty to reveal to this court the fact that they had been preferred and prosecuted and had resulted in his conviction and disbarment. His failure to do so cannot be regarded as other than a willful deception which requires this court, if it is to give effect to that provision of the law permitting only persons of good moral character to be licensed to practice law in the courts of the state, and to maintain the dignity and decency of its bar, to revoke the license previously granted to him.' "

In *State Bar v. Turner*, 31 *Cal. 2d* 842, 192 *P. 2d* 897 (*Sup. Ct.* 1948), the respondent in applying for admission to the bar failed to divulge that he had been convicted of petit larceny, unlawfully obtaining food and lodging from a hotel and for issuing checks without sufficient funds. He was

admitted to the bar. Later in disbarment proceedings he defended on the ground that by reason of his mental condition he had no memory of the events and had no intention to conceal the facts from the committee of bar examiners. The court disposed of this argument, saying:

"It is clear, however, that had the committee known the facts with respect to respondent's criminal record, it would have been justified in declining to recommend him for admission in the absence of proof of rehabilitation. The recommendation of the committee and the order of this court were made under a serious misapprehension of the facts, and in these circumstances it is immaterial that respondent, because of his mental condition, may not have been guilty of intentional concealment." 192 *P.* 2d at *page* 897.

See generally *Note,* 165 *A. L. R.* 1133.

In the light of these authorities the view of the majority seems untenable. Where misconduct before admission to the bar is proved, as here, disbarment is the only adequate remedy. The testimony of the respondent in the hearings before the character and fitness committee, and in his affidavit submitted to the court clearly demonstrate that he still fails to comprehend the responsibilities of a member of an honorable profession. The fact that he has led a respectable life since his admission to the bar three years ago cannot, in my opinion, overcome the sound reasons set forth in the authorities here and elsewhere that hold that disbarment is the only adequate course in cases of fraud in admission to the bar.

If one may overcome such fraud by subsequent good conduct, one must wonder what the effect will be on every subsequent disciplinary proceeding and whether every lawyer, heretofore or subsequently disbarred, should not have the right after three years of good conduct to reinstatement.

Finally, one must be concerned as to what standards the committees on character and fitness are to apply hereafter and the effect of the court's disposition of this matter on their work, as well as on the applications of future lawyers for admission to the bar.

I would disbar the respondent.

I am authorized by Mr. Justice HEHER and Mr. Justice WACHENFELD to state that they join in this opinion.

*For two-year suspension*—Justices OLIPHANT, BURLING, JACOBS and BRENNAN—4.

*For disbarment*—Chief Justice VANDERBILT, and Justices HEHER and WACHENFELD—3.